The following docket is the case of Latoya Graham v. St. Clair County, Illinois and the Sheriff's Office, this at all. We have Mr. Rob Scott for the appellant and we have Sharon Shanahan for the appellee. You may begin Mr. Scott. This case was previously before this court and I believe 2009 an order was issued. This stemmed from a termination of the Sheriff's Merit Commission that wandered its way through the circuit court and up to the appellate court. At the time that that court ruled, the honorable court indicated that there was going to be one charge against Ms. Graham that was going to be sent back for further action. Specifically, the court ruled that they had a question whether the plaintiff's violation of the rule prohibiting her from engaging in conduct that is unbecoming for a member of the department or that tends to reflect discredit on the department as a result of her giving prohibited food items to Jefferson. That was the sole remaining charge that this court felt valid, whether or not that was going to be a basis sufficient to terminate Ms. Graham. The counsel for the plaintiff took that as a remand to the commission with essentially the concept being that you need to explain how this is somehow a substantial shortcoming as opposed to any other typical rule violation. How does this rise to such a level that termination is the appropriate punishment? At least that is how plaintiff and plaintiff's counsel interpreted that order. The commission failed to take that opportunity that this court afforded them and instead issued a second order. The second order mimicked the first order. Going back all the way to 2007, the original order simply said we find you guilty and you're terminated. Granted, there was some other language, but no findings of fact, no explanation, no reference to how this is a substantial shortcoming or anything like that. The second order, after it had been remanded from this court, essentially said, well, we're still going to fire you. Those orders had been entered into the record. Again, no finding of fact, no explanation of how anything is a substantial shortcoming, nothing like that. The reason that I reference these first two orders is because the second order was then appealed to the circuit court. Judge McGlynn opted at that point to again remand it to the commission. So now we are essentially on our third trip back to the commission. And Judge McGlynn essentially said, I'm not seeing that you're comprehending or following or laying out or answering any of the questions raised by the appellate court. And essentially gave them a third opportunity. Apparently, the third time is the charm because we received a new order, and that order is part of the record. It was issued March 22nd, I think, of 2011. And again, I apologize, I'm going by memory, but it's in the record. In that order, there were some shocking new allegations, shocking to the plaintiff at least. Two of them essentially were that the plaintiff had been deceptive in her testimony before the commission. And the second being that her actions constituted a security violation. It was shocking, one, for the reason that in 2007 when the issue was ordered, there was no reference to any of this behavior. None of this. The commission failed to say that either one of these, which is frankly striking considering if this is your basis, how can you not simply set this forth? In 2009, again, no reference to either of these, what I consider to be, what plaintiffs argued, new allegations. Not until March of 2011, four years after this individual has been fired, four years after Ms. Graham has been fired, do we now have the commission claiming that this is the basis. We have argued in our brief view that we consider these to be new allegations. New allegations that deserve a hearing in and of themselves, and therefore to utilize these as a basis of violation of due process. Why, you may ask, do we consider these to be new allegations? The first, as it relates to the deceptiveness, this, although never laid out on the commission, no specific basis, no reference to what is supposedly deceptive, no anything by the commission. They're simply deeming this, you know, they're proclaiming that there was deception. I don't know in what form, you don't know how. So, but the striking thing about the deceptive claim is that it's alleged to have occurred after the charges have been filed by Superintendent Knapp, the administrator of the county jail. He does not file a charge related to deceptiveness. This is an allegation by the commission that it somehow occurred during the course of the hearing. We have never, at any opportunity, had any charge filed with anybody related to it, with any administrative authority, with anybody, with any hearing officer, nothing. They simply come and proclaim it. Now, the second one related to the due process that I referenced relates to the security issue. The claim now, four years later, by this commission, that it creates a security risk. This was touched on at the commission, but it was touched on in this context, and this is all borne out by the record. There was a general statement by Jail Superintendent Knapp that if an officer is found to have given food to somebody, what else might they do? If an officer is found to violate any rule, what else might they do, would be the plaintiff's argument. But more importantly, when that general statement, not particular to Ms. Graham, was raised, it set off fells with the plaintiff's counsel. So I followed up with Mr. Knapp, very succinctly and to the point, said, Mr. Knapp, he filed the charges, he wrote the charges. You have never accused Ms. Graham of a security violation. These charges are not in that vein, correct? Yes, you are correct. I am not charging her with this. Mr. Knapp, you talked about how you have this nebulous concern that maybe somebody might be susceptible to bribery if they did this, or blackmail or something like that. Mr. Knapp, do you have specific evidence that Ms. Graham somehow now falls into that category? No, I do not. The plaintiff believed that we've now addressed this issue. The governing body, the witness representing the employer, has testified at the commission and put an end to this. Only four years later, now do we hear that this is somehow the basis in direct conflict with the sole witness testimony who touched on this. We have a six or eight line question and answer about it, and now you are going to claim, even though there is a denial that it was charged, that this is your basis. This court, when they sent this back, I don't believe envisioned that this was the type of response or order that was going to be obtained. This simply has prolonged this process and really denied the type of justice that should be handed out in these proceedings. How can you sit silently for four years while a person loses a great paying job, great benefits and things like that, and then four years later come and say, this is the basis. I don't consider it to be the basis. I consider it to be new and separate charges. Why do I think they're new and separate charges? Because they were never raised. And even when it was referenced, it was denied by the employer's witness that this was part of the case. Had I known that it was part of the case, certainly there would have been a different tact on plaintiff's part. It was given a cursory nod by the employer, and I don't want to say short shift by plaintiff's counsel, but certainly those two questions would appear to belie any fear that this is going to be a cost for termination of this individual. There was no due process as it relates to either one of these. There was a pronouncement, and that is it. And frankly, the fact that it was a pronouncement is not that much of a shock, at least to this counsel, nor do I believe should it be to this court. This employer has, throughout this process, made it abundantly clear that they do not want review. They do not believe it is appropriate to be reviewed. Essentially, the position that they appear to take is that if we deem it so, it should stand. They will be the arbitrator of all things which result in termination. For the first couple of years of this, I wondered how this was progressing elsewhere. Not until the last appearance at the circuit court did it finally become aware of the apprehension they have regarding actually being reviewed, and it was put in their brief at the circuit court level. They simply told Judge McGlynn that, look, it's self-evident, Judge. It is per se a termination if we decide that this rule has been violated. Now, at the circuit court level, I responded with, I know of no such list of any offenses that are per se. It is not published. If it's published, please provide it to me. You did not enter it at the commission. How do you sit and dare to deem yourself the sole judge of all of this? But it's important to note because that is the mindset of this employer. They will not be bound by anyone. They ignored this process for four years. Mr. Scott, what is the position of Ms. Graham, or what was the position? She was a correctional officer with six years on at the time of her termination. Only one prior discipline, at which point NAF said she was honest and took responsibility, and she had one discipline in the six years prior to termination. There is another point that I do want to quickly address. And it relates to counsel's claim that we have somehow acquiesced to a point which should result in termination. And it relates to this reference to discredit or something along that line she addressed. Negatively impacts morale? Yes, yes, yes, yes, yes, yes. Well, this was originally charged, and that's fairly significant, and it's in the record. This original charge that Ms. Graham faced and was the sole one that survived was that she had engaged in conduct unbecoming. The original charge, I believe, is attached to the first order, which is part of the record. And it was that she had engaged in conduct unbecoming. When I read the third order, I simply read that as, again, another misprint or misstatement of the commission as it relates to the charges. When I read the brief, it appears that they're now claiming that this is a new basis for termination, which, frankly, I don't believe holds water for several reasons. This court, when it sent this case back, said, look, well, you didn't say that. Obviously, I'm not. But you referenced that, you know, conduct unbecoming that tends to reflect discredit on the department as a result of da, da, da. Any time that a rule is violated, clearly, it reflects some discredit upon that officer for their mistake or their error and things like that. But this court had specifically referenced discredit. When I put this along with the commission's order, I simply read it as being the commission, again, mischaracterizing the specific charge of this file. There were several mischaracterizations drawn, so I didn't really think much of it. But once I delved into it more and got here, it struck me that they're essentially advocating for, again, a per se rule. If you're found to have done conduct unbecoming, clearly, there must be some discredit that attaches to it. How is it any different from discredit for getting a speeding ticket or any other countless analogy that one can come up with? When you violate the rules, clearly, there's some sort of pale cast upon your service or that immediate minute. But we don't terminate every individual that's found to have engaged in conduct unbecoming. I think, actually, perhaps they might advocate for the ability to do that based on the things that I've said. But it becomes a rule that swallows up everything. It would essentially make administrative review pointless. Oh, you engaged in conduct unbecoming. You're fired. I mean, it seems that that is what we're working toward in these types of proceedings. I'm on my ninth year here doing these commissions and such. And I have been stricken by the brazen disregard for the process of administrative review by these employers. It is essentially as if the rule of advocating is, if we say it or if we find you guilty, that should be enough. And this was probably one of the most blatant ones, where for four years they felt no need to provide anybody with a basis, even after reviewing it. I'm not sure I'm answering your question regarding the whole discredit thing. Well, I take from their argument, Petitioner's argument, that the discredit was actually upon the Sheriff's Department rather than your client. I don't know how. This case was never publicized. It never made the newspaper. This was an internal rule violation. This was an individual who, it's an internal rule violation. There's no evidence in the record other than, well frankly I would say there's no evidence in the record that this somehow garnered negative public attention. None whatsoever. I think they're talking about internal, I guess. Out of probably 50-some correctional officers, not a single correctional officer was called to testify that they were somehow negatively impacted. Lieutenant White, who was, I mean nobody. The sole, again, it was a pronouncement by jail superintendent name. Well, you know, this looks bad. Well, any time somebody violates a rule, clearly it's wrong. You know, it looks bad. Under that theory, everything would equate to a termination, point blank. All you would need to do in these cases would be to have your superintendent or your sheriff come in and say, yeah, it caused discredit, or it looked bad, or anything like that. I mean, is that, if that is the process that we're going to be going through, or if that is what the analysis and the criteria is going to be, this all becomes pointless. There's, how do you, how do you not need that if you're the employer? Is this now just become a wink and a nod? Sheriff, do you feel you were discredited? Oh yeah, I do. I mean, that is a pretty, pretty low bar to jump over to terminate a six-year employee. I don't know how that can work. Does that answer it a little better? I understand your perspective, yes. Okay. Absent any other questions. Thank you. Thank you, Mr. Shanahan. Thank you. May it please the court. Counsel, my name is Sharon Shanahan, and I represent the people of the state of Illinois. I'd like to begin my argument by focusing on where we are procedurally in this case. This court agreed that Ms. Graham's conduct in giving a dangerous inmate food was conduct unbecoming an officer. She was initially charged with two counts. Don't have the exact vernacular, but it was basically fraternizing with someone in the jail. And this court said, no, that's not good enough. But, yes, she was, her conduct was conduct unbecoming an officer. Then this court said, it is not, and I'm reading from the order. It is not clear from the record, given our conclusion that the commission's findings regarding association charges must be reversed, that the commission would deem termination the appropriate punishment for the one violation of the code which we have affirmed, the plaintiff's violation of the rule prohibiting her from engaging in conduct that is unbecoming from a member of the department, or that tends to reflect discredit on the department as a result of her giving prohibited food items to Jefferson. Accordingly, we remand for a new disciplinary hearing at which the commission shall consider the appropriate punishment in light of our ruling on this order. So, the only question is, what's the appropriate punishment? Food only, right? Food only, but, again, let's put it in context. That sounds pretty simple. That's not a big deal. We need to consider who she gave this, first of all, repeated violations, steak, cookies, pork rinds. Second of all, this was a murderer, a dangerous inmate who had attacked three or four of Ms. Graham's coworkers, the very guards in the St. Clair County Jail that she worked in. He had attacked them. He was dangerous. She was told in her handbook, in a big sign over the door, in her training on ethics when she was at the academy, that you don't fraternize with the people, the jail inmates, don't give them food. She was told by her specific supervisor, Lieutenant White, and in particular, stay away from William Jefferson. He is dangerous. And she knew that he had attacked these other officers. So, what the commission's order clearly reflects is not new charges, but exactly what this court asked them to do. One, should she still be fired for just this one violation? And if so, why? Why do you think that just that one violation is enough? Well, answer me, then answer that question taken from the order. What was the why provided? The why, first of all, is because her conduct discredited the sheriff's department and negatively impacted the morale of the department office. That's one. Well, that's the violation, essentially. What is the how? You can't just say... Well, I thought that's what the appellate court wanted to know. I interrupted you, and so... That's okay, I interrupted you, so we're even, but tell me how. The chart is that her conduct was unbecoming an officer. That's, we're there. We know we're there. Because she gave this food. That's the chart. The next is, why should that be a charge for violation? Well, because that conduct, that giving of food, that's the charge, negatively impacted the morale of the department members. Sergeant Knapp testified that Ms. Graham's actions led to a serious demoralization of the officers who were involved in the attack. People, the inmates that she's doing favors for. They find out, this guy beat the crap out of us, and she's doing favors for him? It's very reasonable that that would be demoralizing. And it shows a disregard for the fellow officers that she works for. I would note that this court, in Duncan v. Highland Board of Police and Fire Commissioners, said that a police officer may be discharged when the officer's conduct is detrimental to the discipline and efficiency of the services. The second reason why her conduct was sufficient to support termination is that, again, this is not a new charge. This is a reason why, is because that conduct of giving food, especially, I mean, verboten regardless, but giving food, especially to dangerous inmates, affects the safety and security of the jail. That's not a charge. That's a reason why this particular conduct should be caused for termination. There's evidence in the record that indicates that the inmates know the guards are not supposed to do this. If they do it once, that makes them susceptible to inmate pressure because they ask them to do it the first time they ask. When it gets done the second time they tell because the correctional officer knows that they've done something wrong. Furthermore, again, it doesn't take a genius to figure out that if you're close enough to an inmate to be passing him food, you are in serious danger. All they have to do is reach through the bars, grab your arm, grab your neck. And, again, consider, I think it's important to consider, this wasn't somebody that was in there for a minor traffic violation or possession of a tiny amount of cannabis. This was a murderer who, in that jail, had attacked security guards. Sergeant Knapp found this to be, and I am quoting, an absolute insult to the officers who were attacked. Again, he said it did lead to serious demoralization of the officers that were involved in the attack. Lieutenant White said that Jefferson was very much a security risk and extremely dangerous, caused serious injury to three or four correctional officers. She told Graham not to socialize with any inmate and, in particular, not to socialize with Jefferson. And she testified that Graham exhibited behavior that would jeopardize the security and order of the institution. What was the deceptive behavior? She lied to the commission in her testimony, and it's very clear. There is, in the record, a DVD of her interview when these charges were first brought forth. She admitted in that interview that she did give him food. But then when she testified at the hearing, she denied giving him food. She said, well, there was this, first she denied it entirely, and then she said, well, actually, I had a sandwich in the jail one time, and another inmate, not Jefferson, but another inmate reached through the bars and touched it, and that she dropped it after he touched it. I guess the intimation being that then somebody reached through the bars and got there. But that completely contradicts her testimony in the interview, which was submitted to the commission. She was also deceptive in some of her answers. For example, she was asked, did you pass steak to Jefferson? And she said, we're not sure if it was steak. Well, what kind of an answer is that? Finally, she denied flatly giving him cookies and pork rinds when there was evidence before the commission from inmate Anthony who said he saw with his own eyes that Graham had given inmate Jefferson cookies and pork rinds. Now, on the first appeal in this case, one of the big issues was, well, was inmate Anthony credible because he's an inmate? Apparently, they thought he was more credible than she was, is that what you're saying? And that specific finding was this court specifically said they listened to her, they listened to Anthony, they chose to believe Anthony. So I think it is fair to say that the commission found Anthony credible, this court found the commission's reliance on Anthony reasonable. And so for those reasons, there's no new charges here and there is just cause to terminate. I have to comment on one thing before I go into the second issue. I feel like there was a great deal of conversation in my opponent's argument that has nothing to do with the issue raised before this court and nothing to do with the record on appeal. I think that there is a mindset of this employer to not be bound by anyone, that they can just decide that conduct, that they charge someone without conduct of becoming, that's enough and no one can tell them differently. That we get to decide that's not in the record, that's not in the appeal, that's not, it doesn't belong in this argument and it certainly has nothing to do with the issues before this court. Getting back to what I feel is truly the only issue before this court is whether there was just cause to terminate. Counsel for the plaintiff says that when he read this order, he read this underlying thing in there that said that, oh, that's probably by itself not enough to support it. I just read this court, its order. Its order is in the record, obviously. You can take judicial notice of it. There is no intimation in that order that this court had any opinion whatsoever about whether the one remaining charge was sufficient to support termination. The court said that this grant's conduct was conduct unbecoming to an officer. This court said, we want you to tell us whether that one conduct alone is sufficient and tell us why. Actually, this court didn't say tell us why. Justice McGlynn said tell us why. But that's all the order says. That's all the order says is there is, one charge is supported, is that one charge alone enough? There is no, nothing in there to indicate any predisposition on the part of this court to say that that probably was not enough. This court simply remanded for a new disciplinary hearing at which the commission should consider the appropriate punishment in light of the order. So, I think I've touched upon the reasons that Ms. Graham's conduct does support termination. It negatively affected the morale. It negatively affected the security. I think the references to deception simply refer to the fact that in a jail situation, being able to trust your employees is critical. And a person that is deceptive in sworn proceedings before the commission is not the kind of person you want in a jail situation. I would like to briefly discuss with this court the case of North v. DeWitt County Sheriff's Department Merit Commission, which I find extremely similar to this case. Mr. North was charged with what is described as a verbal tyranny. He said some deputies would sell their souls to keep a job. He said others were too immature for their jobs. And he said that another officer had no business running for the Sheriff's Department. That's his conduct. That's his conduct on becoming an officer. That's what he did. That's all he did. A co-worker was present when he made these comments. That co-worker testified that he was dumbfounded by North's conduct and did not feel he could count on him to do his job. The commission felt that his comments impaired the administration and operation of the Sheriff's Department and they discharged North. The appellate court found that North's tirade against his colleagues adversely affected the morale of the department and could only be viewed as a personal affront to the other deputies. I think we can say exactly the same thing about the actions in this case. Ms. Graham's actions in doing favors for a dangerous inmate who had attacked her fellow workers was definitely a personal affront to those people. An absolute insult as characterized by Sergeant Knapp. And it definitely jeopardized the morale, the security, and the order of the institution. As in North, this court should determine that the merit commission's order terminating grant is supported by the evidence. Are there any questions? I don't think so. Thank you, Ms. Graham. Mr. Scott, do you have a vote? This was remanded for new hearing, but I'm sure the court has gleaned this, but although there was new hearing order, there was no new evidence introduced. The sole evidence that was taken was on September 17th and September 21st. There were simply arguments made at the new hearing and nothing else. Counsel referenced this giving, giving, giving. The evidence in the record indicates that it was taken, and that evidence came from Ms. Graham, who did testify. Counsel referenced that, you know, it appears in retrying this again in front of the commission, almost, based on some of these things. We're going back to these facts, which I don't think this was ever sent back to the court for, but so be it. I feel compelled to address some of these. A few references is that there were repeated violations of this giving food to them, and it's odd because that's inconsistent with Captain Mapps, jail superintendent Mapps. He's not a sergeant, he's a captain, who testified on September 17th of 2008 that he had absolutely no evidence that multiple food items were given to Jefferson by Graham. Essentially the sole linchpin in this case was my client's honesty, and I applaud her for it. It may come at an extreme price, we'll see. When she was interviewed, which you have the DVD, out of the blue, Kinney, Sergeant Kinney, says, oh, I also have allegations that you gave food to somebody. And she looks at me and she goes, you mean a sandwich? And at that point there's an objection by the field representative because Ms. Graham was not notified of this violation, violation of uniformed police officer's discipline, doesn't matter, wasn't raised. Ms. Graham wasn't deceptive. She has been and always was confused regarding what they were alleging. By her own admission, she referenced the sandwich, but was never asked how did it come to be in possession of the inmates. Not until finally at the trial did I ask her what happened, how did this happen, and she testified how it happened. She never denied that food ended up in the hands of inmates, never once. She simply tried to explain the difference between something being given intentionally as a favor, which, by the way, there's no evidence of that. I dealt with that at the commission level again. Captain Knapp read Sergeant Kinney's report. From that, he gleaned that it was done as a favor. That report was never entered into evidence. Kinney was never testified that it was done as a favor, and Graham denied that there was any sort of favoritism being played. This is something that did happen. She didn't deny that it happened. She didn't deny that contraband ended up in their hands. The funny thing is that Sergeant Kinney, on the interrogation that you watch, sits and talks about how important why is. Sits and tells her, well, you know, if this happened, why is really important. We need to know this. But yet nobody cared why. They didn't ask. The employer didn't call her and explain how this happened. Nobody did, not until we did. If you go and then look, and she says she lied, that she denied that food ended up in the hands of the inmates. She doesn't. On page 47 of, and now this is not part of the base stamp record. It's the September 21st transcript. She references, it essentially admits that, yes, we know food got to this guy, but we don't know that it was a steak. It was a sandwich. Again, she reiterates that, look, I'm walking out eating this sandwich because I have to take medicine. I have to eat it at a certain time. And they reached out and grabbed her. Grabbed the sandwich. And she doesn't say, I dropped it. She said, I let it go. Well, if you go back to the original hearing again, you find out that she's not doing something crazy by walking through here. They can reach you. This is all laid out in the original hearing. You can't walk through this block without being able to be physically touched by the inmates unless you turn sideways and scoot along the wall. According to Lieutenant White. Something that I said, Miss White, is that something that she should do? Of course not. She shouldn't do that. It portrays fear. She should walk straight through. If they grab something, what should you do, Miss White? You should let it go. You shouldn't fight. Which is what she did. She took something she was eating back and she shouldn't go. That's it. That's the only thing that was ever borne out by any of this. She didn't lie at the hearing. She specifically, essentially said, yeah, something was given to him, but I don't know that it was steak. But I don't remember what I was eating. I didn't, you know, we once again get into this credibility issue. Oh. It's up. That was quick. It's like a shot in the dark. Thank you for your briefs and arguments and we'll take any other under advisement.